# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**FOREST GUARDIANS**,

      Plaintiff,

vs.                           No. **CIV 01-504 MCA/KBM-ACE**

**UNITED STATES FOREST SERVICE, HONORABLE ANN VENEMAN**, in her capacity as Secretary of Agriculture of the United States,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Plaintiff's *Motion for Review of Agency Action* [Doc. No. 8] filed on August 14, 2001, *Federal Defendant's Motion to Dismiss, Memorandum in Support, and Supplemental Brief on the Merits* [Doc. No. 38] (hereinafter *Motion to Dismiss*) filed on April 11, 2002, and Plaintiff's *Motion for Leave to File Amended Complaint* [Doc. No. 42] filed on September 19, 2002.  Having considered the submissions of the parties, the Administrative Record, the applicable law, and otherwise being fully advised in the premises, the Court finds that grounds exist for granting in part and denying in part Plaintiff's *Motion for Review of Agency Action*, granting in part and denying in part Defendants' *Motion to Dismiss*, and granting in part and denying in part Plaintiff's *Motion for Leave to File Amended Complaint* as explained below.

I.    **BACKGROUND**

On September 6, 2001, Plaintiff Forest Guardians filed its ***First Amended Complaint*** ***for Declaratory and Injunctive Relief*** [Doc. No. 17] (hereinafter ***First Amended Complaint***) against Defendants United States Forest Service (USFS) and Secretary of Agriculture Ann Veneman seeking judicial review pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706 (2000), and the citizen suit provision of the Endangered Species Act (ESA), 16 U.S.C. § 1540(g) (2000).   Plaintiff's ***First Amended Complaint*** challenges Defendants' acts or omissions with respect to livestock grazing on the Copper Creek Allotment in the Gila National Forest in Catron County, New Mexico, and its impacts on three species protected under the ESA, namely the Mexican Spotted Owl, the Spikedace, and the Loach Minnow.  Plaintiff seeks a declaratory judgment that Defendants are in violation of the consultation requirements in Section 7 of the ESA, 16 U.S.C. § 1536 (2000), and its implementing regulations, as well as the consistency requirements in Section 6 of the National Forest Management Act (NFMA), 16 U.S.C. § 1604(i) (2000), and its implementing regulations.   Plaintiff's ***First Amended Complaint*** also seeks an injunction ordering Defendants to initiate formal consultation under the ESA with regard to grazing on the Copper Creek Allotment and to take "such action as the law requires" to protect the Mexican Spotted Owl, Spikedace, and Loach Minnow from the threat of extinction in the interim. Plaintiff further requests that the Court award attorney fees under Section 11 of the ESA, 16

U.S.C. § 1540(g)(4), and retain jurisdiction over this matter to ensure compliance with its orders.  Defendants deny that Plaintiff is entitled to such relief.

**A.**    **The ESA Consultation Process**

Section 7(a)(2) of the ESA states, in relevant part, that:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species. . . .   In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2).  Section 7(d) of the ESA further provides that:

> After initiation of consultation required under subsection (a) (2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a) (2) of this section.

16 U.S.C. § 1536(d).  With regard to the species at issue in this case, these statutory requirements are implemented through federal regulations issued by the United States Fish and Wildlife Service (USFWS).

Section 7 of the ESA and its implementing regulations "apply to all actions in which there is discretionary Federal involvement or control."  50 C.F.R. § 402.03.  In addition, the "[c]onsultation, conference, and biological assessment procedures under [S]ection 7 may be consolidated with interagency cooperation procedures required by other statutes, such as the National Environmental Policy Act (NEPA)."  50 C.F.R. § 402.06(a) (citation omitted).

"Satisfying the requirements of these other statutes, however, does not in itself relieve a Federal agency of its obligations to comply with the procedures set forth in [these regulations] or the substantive requirements of [S]ection 7" of the ESA. Id.

Under the USFWS regulations, "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). Federal agencies may conduct such reviews and make such determinations through preparation of a "biological assessment," see 50 C.F.R. § 402.12, or through "informal consultation" with the USFWS, see 50 C.F.R. § 402.13.

> A biological assessment shall evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary.

50 C.F.R. § 402.12(a). "Informal consultation is an optional process that includes all discussions, correspondence, etc., between the [USFWS] and the Federal agency . . . designed to assist the Federal agency in determining whether formal consultation or a conference is required." 50 C.F.R. § 402.13(a). "During informal consultation, the [USFWS] may suggest modifications to the action that the Federal agency and any applicant could implement to avoid the likelihood of adverse effects to listed species or critical habitat." 50 C.F.R. § 402.13(b).

If the Federal agency determines that an action "may affect listed species or critical habitat," then "formal consultation is required," 50 C.F.R. § 402.14(a), unless "as a result of the preparation of a biological assessment under § 402.12 or as a result of informal

-4-

consultation with the [USFWS] under § 402.13, the Federal agency determines, with the written concurrence of the Director [of the USFWS], that the proposed action is not likely to adversely affect any listed species or critical habitat," 50 C.F.R. § 402.14(b); accord 50 C.F.R. §§ 402.12(k) and 402.13(a).  In cases where there is both a determination of "not likely to adversely affect" and a written concurrence from the Director of the USFWS, the consultation process terminates and no further action is necessary.  See 50 C.F.R. §§ 402.13(a) and 402.14(l)(3).

In cases where a formal consultation with the USFWS is initiated, however, the consultation process does not terminate until the USFWS formulates a "biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of  listed species or result in the destruction or adverse modification of critical habitat."  50 C.F.R. § 402.14(g)(4); see 50 C.F.R. § 402.14(l)(1).  Under certain conditions where a statute authorizes an agency "to take incremental steps toward the completion of the action, the [USFWS] shall, if requested by the Federal agency, issue a biological opinion on the incremental step being considered, including its views on the entire action."  50 C.F.R. § 402.14(k).

If the USFWS's biological opinion is that such jeopardy is likely to result, then it shall also include "reasonable and prudent alternatives, if any," that the Federal agency and the applicant can take to avoid violation of Section 7(a)(2) of the ESA.  50 C.F.R. § 402.14(h)(3).  The Federal agency is then obligated to "determine whether and in what

manner to proceed with the action in light of its [S]ection 7 obligations and the [USFWS's] biological opinion." 50 C.F.R. § 402.15(a).

Federal agencies' obligations under Section 7(a)(2) of the ESA include not only the procedural requirement of consulting with USFWS, but also the substantive requirement of insuring at all times that their actions are not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of critical habitat. See 16 U.S.C. § 1536(a)(2). In addition, the prohibition on making an "irreversible or irretrievable commitment of resources" in Section 7(d) of the ESA, 16 U.S.C. § 1536(d), "is in force during the consultation process and continues until the requirements of [S]ection 7(a)(2) are satisfied." 50 C.F.R. § 402.09.

### B.   The Mexican Spotted Owl

The Mexican Spotted Owl was listed as a threatened species under the ESA on March 16, 1993. See Final Rule to List the Mexican Spotted Owl as a Threatened Species, 58 Fed. Reg. 14248 (Mar. 16, 1993). In 1996, the USFS amended its land-use plans for national forests in Arizona and New Mexico to incorporate special management considerations and protections for this subspecies of spotted owl, and critical habitat for the owl on lands outside the national forests in Arizona and New Mexico was designated on February 1, 2001. See Final Designation of Critical Habitat for the Mexican Spotted Owl, 66 Fed. Reg. 8530, 8543 (Feb. 1, 2001).

The Mexican Spotted Owl inhabits mixed coniferous and pine/oak forests, canyons, desert caves, and riparian areas throughout the southwestern United States and Mexico,

where it subsists on a varied diet of small and medium-sized rodents, bats, birds, reptiles, and arthropods.  See id. at 8530-31.  The central portion of the species' range within the United States (containing over half of known owl sites) is located in central Arizona and west-central New Mexico, including areas of the Gila National Forest in New Mexico.  See id. Although there are other factors or conditions which threaten the species, certain livestock grazing practices also may pose such a threat because of their potential to influence habitat composition and structure, and to affect food availability and diversity.  See USFWS, Recovery Plan for the Mexican Spotted Owl 103 (1995).  (AR 8.4(a), at 103.)

C.   **The Spikedace and Loach Minnow**

The Spikedace was listed as a threatened species under the ESA on July 1, 1986.  See Determination of Threatened Status for the Spikedace, 51 Fed. Reg. 23,769 (July 1, 1986). The Loach Minnow was listed as threatened species under the ESA on October 28, 1986. See Determination of Threatened Status for the Loach Minnow, 51 Fed. Reg. 39,468 (Oct. 28, 1986).  On April 25, 2000, the USFWS designated almost 900 miles of rivers and creeks as critical habitat for these two species of fish.  See Final Designation of Critical Habitat for the Spikedace and Loach Minnow, 65 Fed. Reg. 24,328 (Apr. 25, 2000).  Some of the rivers and creeks designated as critical habitat for the Spikedace and Loach Minnow flow through the Gila National Forest in New Mexico.  See id. at 24,335.

The Spikedace and Loach Minnow occupy moderate to large perennial streams throughout the southwestern United States.  Their historic range and abundance has been severely reduced by habitat destruction (including channel downcutting, substrate

sedimentation, water diversion, and groundwater pumping), as well as competition and predation by nonnative aquatic species.  Certain livestock grazing practices may contribute to the destruction of these species' habitat inasmuch as they damage the watershed, increase sedimentation and channel erosion, and alter natural flooding cycles.  See 51 Fed. Reg. at 24,328-329; 51 Fed. Reg. at 39,468-469.

### D.   The Gila National Forest Plan

In September 1986, the United States Forest Service (USFS) issued the Gila National Forest Plan pursuant to its responsibilities under NFMA.  (AR 2.0.)  The purpose of the Gila National Forest Plan, as amended, is to define "the direction for managing the Gila National Forest for the next 10-15 years."  (AR 2.0, Plan at 1.)  Upon their approval, the plan and its amendments provide the basis for all subsequent activities in the forest, and all permits, contracts, and other instruments for the use and occupancy of these national forest system lands must be consistent with the forest plan.  See 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10; Forest Service Manual § 2213, available at http://www.fs.usda.gov/im/directives.  (AR 2.0, Plan at 1.)

As issued in 1986, the Gila National Forest Plan contains two "standards and guidelines" which Plaintiff claims are relevant here.  The first "standard and guideline" is to "[m]anage riparian areas to protect the productivity and diversity of riparian-dependent resources by requiring actions within or affecting riparian areas to protect and where applicable, improve dependent resources," and to "[e]mphasize protection of soil, water, vegetation, and wildlife and fish resources prior to implementing projects."  (AR 2.0, Plan

at 30.)  The second "standard and guideline" is to "[g]ive preferential consideration to resources dependent on riparian areas over other resources.  Other resource uses and activities may occur to the extent that they support or do not adversely affect riparian-dependent resources."  (Id.)

In 1996, the USFS amended its forest plans for Arizona and New Mexico, including the plan for the Gila National Forest, for the purpose of incorporating special management considerations and protections for the Mexican Spotted Owl and the Northern Goshawk (another protected species under the ESA).  (AR 2.0, Record of Decision for 1996 Forest Plan Amendments.)  The 1996 amendments contain both "standards" and "guidelines."  The standards provide the primary, nondiscretionary constraint "within which all management activities are to be carried out," while the guidelines "provide additional details on how each standard will be implemented" and "may occasionally contain discretionary elements."  (Id. at 87.)

The specific standards for the Mexican Spotted Owl "provide three levels of habitat management—protected, restricted, and other forest and woodland types to achieve a diversity of habitat conditions across the landscape."  (Id.)  "Protected areas" include "protected activity centers" or "PACs," which generally are delineated based on known nesting or roosting sites for the owls.  These areas are afforded the highest level of protection under the standards and guidelines in the 1996 forest plan amendments.  (Id. at 87-89.)

"Restricted areas include all mixed-conifer, pine-oak, and riparian forests outside of protected areas[,]" and are afforded an intermediate level of protection under these standards

and guidelines.  (Id. at 87.)  The 1996 forest plan amendments contain the following guidelines for "restricted areas" which Plaintiff claims are relevant in this case.  The first is to "[e]mphasize maintenance and restoration of healthy riparian ecosystems through conformance with forest plan riparian standards and guidelines.  Management strategies should move degraded riparian vegetation toward good condition as soon as possible. Damage to riparian vegetation, stream banks, and channels should be prevented."  The second is to "[i]mplement forest plan forage utilization standards and guidelines to maintain owl prey availability, maintain potential for beneficial fire while inhibiting potential destructive fire, maintain and restore riparian ecosystems, and promote development of owl habitat," and to "[s]trive to attain good to excellent range conditions."  (Id. at 90.)

In addition to the specific standards and guidelines regarding the Mexican Spotted Owl, the 1996 forest plan amendments contain a general standard and guidelines for grazing management.  The general standard states that:  "Forage use by grazing ungulates will be maintained at or above a condition which assures recovery and continued existence of threatened and endangered species."  (Id. at 94.)  The guidelines for grazing management direct the USFS to "develop site-specific forage use levels" in consultation with the USFWS. They also provide a table of allowable forage-use levels to be applied in instances where site-specific information is unavailable.  (Id.)  "These guidelines are to be applied in the absence of more specific guidelines currently established through site specific NEPA analysis for individual allotments."  (Id.)

The USFWS expressly relied on the 1996 forest plan amendments as the grounds for excluding National Forest lands in Arizona and New Mexico from its final critical habitat designation for the Mexican Spotted Owl.  See 66 Fed. Reg. at 8543.  In its final critical habitat designation for the owl, the USFWS reasoned that although the central portion of the species' range within the United States (containing over half of known owl sites) is located in central Arizona and west-central New Mexico, see id. at 8530, it was unnecessary to designate the national forest lands in these states as critical habitat because the special management considerations and protections to be afforded by critical-habitat designation were already in place by virtue of the 1996 forest plan amendments, see id. at 8543.

In particular, the USFWS determined that:

Additional special management is not required if adequate management or protection is already in place.  Adequate special management considerations or protection is provided by a legally operative plan/agreement that addresses the maintenance and improvement of the primary constituent elements important to the species and manages for the long-term conservation of the species.  We use the following three criteria to determine if a plan provides adequate special management or protection:  (1) A current plan/agreement must be complete and provide sufficient conservation benefit to the species; (2) the plan must provide assurances that the conservation management strategies will be implemented; and (3) the plan must provide assurances that the conservation management strategies will be effective, i.e., provide for periodic monitoring and revisions as necessary.

Id.  The USFWS further determined that the USFS had

amended their National Forest Plans in Arizona and New Mexico to conform with the Mexican Spotted Owl Recovery Plan, and these plans adequately meet all of our three criteria.  The plan provides a conservation benefit to the species since it incorporates all elements of the Recovery Plan; the plan provides assurances that the management plan will be implemented since the [US]FS in the Southwest Region has authority to implement the plan and has

-11-

obtained all the necessary authorizations or approvals; and the plan provides assurances that the conservation plan will be effective since it includes biological goals consistent with the Recovery Plan, monitoring, and adaptive management.

Id.

### E.  The Grazing Permit for the Copper Creek Allotment

For purposes of managing livestock grazing, the Gila National Forest is divided into allotments. See 36 C.F.R. § 222.2(a); Forest Service Manual § 2210.31. By means of a term grazing permit, the USFS authorizes the number, kind, and class of livestock to be grazed on each allotment. Term grazing permits typically are effective for a ten-year period, but can be modified, suspended, or canceled for a number of reasons. See 36 C.F.R. §§ 222.3, 222.4; Forest Service Manual § 2231. Each term grazing permit is accompanied by an allotment management plan (AMP), which becomes part of the permit and prescribes a site-specific management regime for the allotment. See 36 C.F.R. §§ 222.1(b)(2), 222(b); Forest Service Manual § 2212. In addition, the USFS issues annual operating instructions (AOIs) or annual operating plans (AOPs) which contain further instructions based on the range and resource conditions for a particular year. See Forest Service Manual § 2212.3. (AR 26.0.) Finally, the issuance of a term grazing permit generally requires an environmental assessment (EA) and/or an environmental impact statement (EIS) under the National Environmental Policy Act (NEPA). See 42 U.S.C. § 4332 (1994); 40 C.F.R. §§ 1501.3, 1508.9; Forest Service Manual ch. 1950, 2210.

The Copper Creek Allotment encompasses 25,583 acres in the Gila National Forest's Glenwood Ranger District.  This allotment contains numerous PACs (or Protected Activity Centers) for the Mexican Spotted Owl, and owls were detected in and/or near these PACs in 2000/2001 surveys.  (AR 28.0, at 9; AR 20.0, at Map 6.)

The Copper Creek, Mineral Creek, and Indian Creek drainages flow through the Copper Creek Allotment.  Copper Creek and Mineral Creek drain to the San Francisco River.  Indian Creek drains to the Gila River.  (AR 33.0, 34.0.)  Both the Gila River and the San Francisco River contain critical habitat for the Loach Minnow and Spikedace, although in both instances the critical habitat is located downstream of the Copper Creek Allotment and not in the allotment itself.  (AR 27.0, at 8.)

The same family has been grazing livestock in this allotment since the 1870s.  (AR 13.0, at 3.)  In 1986, the USFS issued a grazing permit for the Copper Creek Allotment that covered a ten-year term which expired on December 31, 1996.  The permit is for a cow-calf operation that includes five (5) horses and eighty-five (85) cattle, twenty-seven (27) of which are permitted conditionally and subject to adjustment as specified in the permit's special provisions and requirements.  (AR 2.1.)

In 1995, the following rider affecting certain grazing permits issued by the USFS was attached to an appropriations bill that subsequently was enacted by Congress:

> SEC. 504.    (a)    SCHEDULE FOR NEPA COMPLIANCE.—Each National Forest System unit shall establish and adhere to a schedule for the completion of [NEPA] . . . analysis and decisions on all allotments within the National Forest System unit for which NEPA analysis is needed.  The

schedule shall provide that not more than 20 percent of the allotments shall undergo NEPA analysis and decisions through fiscal year 1996.

(b)    REISSUANCE PENDING NEPA COMPLIANCE.—Notwithstanding any other law, term grazing permits which expire or are waived before the NEPA analysis and decision pursuant to the schedule developed by individual Forest Service System units, shall be issued on the same terms and conditions and for the full term of the expired or waived permit.  Upon completion of the scheduled NEPA analysis and decision for the allotment, the terms and conditions of existing grazing permits may be modified or re-issued, if necessary to conform to such NEPA analysis.

(c)    EXPIRED PERMITS.—This section shall only apply if a new term grazing permit has not been issued to replace an expired or waived term grazing permit solely because the analysis required by NEPA and other applicable laws has not been completed and also shall include permits that expired or were waived in 1994 and 1995 before the date of enactment of this Act.

Emergency Supplemental Appropriations for Additional Disaster Assistance, for Antiterrorism Initiatives, for Assistance in the Recovery from the Tragedy that Occurred at Oklahoma City and Rescissions Act of 1995 (hereinafter "1995 Rescissions Act"), § 504, Pub. L. 104-19, 19 Stat. 194, 212-213 (July 27, 1995).  (AR 8.0.)  The USFS issued a series of memoranda regarding its scheduling duties under Section 504 of the 1995 Rescissions Act which are part of the Administrative Record in this case.  (AR 8.1 through 8.7.)

At the time the term grazing permit for the Copper Creek Allotment expired in 1996, the USFS had not completed a NEPA analysis for the allotment, nor had the USFS initiated consultation with the USFWS under Section 7(a)(2) of the ESA regarding the permit's potential impact on the Spikedace, Loach Minnow, or Mexican Spotted Owl.  Nevertheless, the USFS reissued the grazing permit on January 8, 1997, with essentially the same terms

and conditions as the 1986 permit, except for two items listed in the 1997 permit's special provisions and requirements.  (AR 12.0.)

One of these new provisions lists "specific standard and guidelines from the [Gila National] Forest Plan applicable to the allotment."  (AR 12.0, at 7.)  This list makes reference to the standards and guidelines from the 1986 Forest Plan and contains a generic instruction to "[m]anage for recovery of threatened, endangered, or sensitive species if you are told that they are on the allotment." (AR 2.0, 1986 Forest Plan at 22-49; AR 12.0, at 7). The 1997 term grazing permit does not, however, contain any specific reference to the additional standards and guidelines from the 1996 forest plan amendment, or any special management considerations or protections for the Mexican Spotted Owl, Spikedace, or Loach Minnow. (AR 2.0, Record of Descision for 1996 Forest Plan Amendments at 5, 87-95; AR 12.0, at 7.)

The other new provision in the 1997 term grazing permit states, in relevant part, that: "In 1997, an Environmental Assessment will be done on the management of the Copper Creek Allotment to make sure that it complies with the National Environmental Policy Act (NEPA). . . .  Until the completion of this assessment, manag[e]ment will follow that outlined in the 1977 Allotment Management Plan or decisions made during annual meetings or other documented agreements."  (AR 12.0, at 6.)

The Administrative Record does not contain the 1997 environmental assessment referenced in the 1997 term grazing permit for the Copper Creek Allotment, if such a document exists.  The documents in the Administrative Record also do not evince an

-15-

initiation of consultation under Section 7(a)(2) of the ESA with regard to the effects of livestock grazing on the Copper Creek allotment until after Plaintiff's complaint was filed in this Court on May 4, 2001.

The only allotment-specific documents in the Administrative Record that are dated between the issuance of the term grazing permit on January 8, 1997, and the filing of Plaintiff's complaint on May 4, 2001, consist of a grazing capacity analysis dated January 17, 1997 (AR 13.0), an environmental analysis of cumulative watershed effects dated January 28, 1999 (AR 19.0), some forage monitoring data dating from October 31, 2000, to November 2, 2000 (AR 22.0, 23.0, 24.0), and the Annual Operating Plan/Instructions dated March 2, 2001 (AR 26.0). The latter document does not change the number of livestock permitted on the allotment, but specifies time frames for use of each of the allotment's four main pastures and prescribes mitigation measures aimed at reducing trampling and grazing impacts to vegetation and insuring that forage-use levels are not exceeded. (AR 26.0.)

In a series of documents dated May 25, 2001, (twenty-one days after the filing of Plaintiff's complaint), the USFS reported its evaluation and assessment of the effects of livestock grazing in the Copper Creek Allotment on the Spikedace, Loach Minnow, Mexican Spotted Owl, and other threatened or endangered species. The assessment for the Mexican Spotted Owl covers a three-year period beginning with the 2001 grazing season. (AR 28.0, at 4.) The evaluation for the Spikedace and Loach Minnow refers to the 2001 Annual Operation Instructions and the time frame provided therein. (AR 27.0, at 1.) Neither the assessment for the Mexican Spotted Owl, nor the evaluation for the Spikedace and Loach

Minnow contain any indication that they are intended to cover the entire ten-year term of the 1997 grazing permit or that they form part of an incremental-step analysis concerning that permit pursuant to 50 C.F.R. § 402.14(k).

With regard to the Mexican Spotted Owl, the USFS requested a formal consultation with the USFWS based on a biological assessment which determined that: "The Copper Creek Allotment is being managed in a manner that will have adverse [e]ffects to Mexican spotted owls and their habitat." (AR 28.0, at 1.) The biological assessment further noted that the allotment contains numerous "PACs" (or "Protected Activity Centers") for the owl and that surveys in 2000/2001 detected owls "in and/or near all of the PACs." (Id. at 9.) Despite these findings, the USFS also concluded, pursuant to Section 7(d) of the ESA, that "there will be no irreversible or irretrievable commitments of resources on the Copper Creek Allotment regarding the Mexican spotted owl that would foreclose the formulation of reasonable and prudent alternatives during the consultation period May 25, 2001 through September 30, 2001." (AR 29.0.) The USFS later amended this conclusion to extend the consultation period from September 30, 2001, to September 30, 2002. (AR 29.0.) The Administrative Record does not evince the completion of the requested formal consultation on the Mexican Spotted Owl.

With regard to the Spikedace and Loach Minnow, the USFS concluded that ongoing grazing on the Copper Creek Allotment may affect, but was not likely to adversely affect, the two species of fish or their critical habitat during the period for which consultation was initiated. (AR 27.0.) The USFS requested the concurrence of the USFWS in this finding,

per the ESA's informal consultation provisions.   No such concurrence appears in the Administrative Record, nor is there any finding as to whether the USFS has made an "irreversible or irretrievable commitment of resources" within the meaning of Section 7(d) of the ESA while the USFS was awaiting such a concurrence from the USFWS.

After the Administrative Record was lodged in this case, the Court issued an order [Doc. No. 28] setting a briefing schedule modeled on the Federal Rules of Appellate Procedure.  Defendants requested [Doc. Nos. 15, 32, 34] and were granted [Doc. Nos. 28, 33, 35] several extensions of time to complete the required briefing.  After such briefing was completed, Defendants filed a motion to dismiss some of Plaintiff's claims on the grounds that the USFWS had very recently fulfilled some of the consultation requirements that Plaintiff was seeking to enforce with regard to livestock grazing on the Copper Creek Allotment.  [Doc. No. 38.]

Exhibit A to Defendants' ***Motion to Dismiss*** indicates that on May 10, 2002 (seven days after Defendants filed their response brief in this matter), the USFWS concurred with the USFS's findings as to the Spikedace, the Loach Minnow, and their critical habitat.  In addition, Exhibits B, C, D, and E to Defendant's ***Motion to Dismiss*** indicate that, during the consultation process for the Mexican Spotted Owl, the USFS voluntarily added certain conservation measures to the proposed action and, with the understanding that those additional measures would be implemented, the USFWS issued a letter dated July 11, 2002, concurring in the USFS's revised finding that the Mexican Spotted Owl is not likely to be adversely affected by the modified Annual Operating Plan/Instructions for livestock grazing

in the Copper Creek Allotment during the three-year period beginning with the 2001 grazing season.

Based on this new development, Plaintiff requested [Doc. No. 39] and was granted [Doc. No. 40] an extension of time in which to respond to Defendants' ***Motion to Dismiss***. Along with their response to Defendants' motion, Plaintiff filed a motion for leave to file a second amended complaint adding USFWS as a defendant and adding a claim that certain actions of the USFWS with regard to the consultation process for the Copper Creek Allotment are arbitrary, capricious, and contrary to law.  [Doc. No. 42.]  Defendants do not oppose Plaintiff's ***Motion for Leave to File  Amended Complaint***, but they maintain that some of the claims in Plaintiffs' ***First Amended Complaint*** should be dismissed as moot or unripe.  It is under this somewhat complex procedural posture that the Court addresses the motions pending before it.

## II.    <u>ANALYSIS</u>

### A.    <u>Standard of Review</u>

This Court's review of whether Defendants' actions are in compliance with the ESA and NFMA is governed by the standard set forth in Section 706 of the APA, 5 U.S.C. § 706 (2000).  <u>See</u> <u>Friends of the Bow v. Thompson</u>, 124 F.3d 1210, 1217 (10th Cir. 1997) (reviewing NFMA claim); <u>Wyo. Farm Bureau Fed. v. Babbitt</u>, 199 F.3d 1224, 1231 (10th Cir. 2000) (reviewing ESA claim).  Section 706 of the APA provides that:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and

statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

(1)    compel agency action unlawfully withheld or unreasonably delayed;  and

(2)    hold unlawful and set aside agency action, findings, and conclusions found to be—

(A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)    contrary to constitutional right, power, privilege, or immunity;

(C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)    without observance of procedure required by law;

(E)    unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute;  or

(F)    unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

With regard to an agency's factual determinations, this standard of review is a deferential one that does not allow the Court to displace the agency's choice between two fairly conflicting views, so long as that choice is supported by substantial evidence.  See Wyo. Farm Bureau Fed., 199 F.3d at 1231.  In reviewing an agency action to determine

whether the agency's reasoning for that action is arbitrary and capricious, the Court considers whether

> the agency . . . relied on factors which Congress [had not] intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

With regard to issues of law on which Congress is silent, the Court defers to an agency's construction if Congress has delegated authority over the subject matter to the agency and the agency's construction is not unreasonable or impermissible. See Wyo. Farm Bureau Fed., 199 F.3d at 1231. If Congress has spoken clearly on the issue, however, the Court gives strict effect to the statutory language without deferring to the agency's interpretation. See id. Further, if an agency action falls short of the standards set forth in Section 706 of the APA, Congress has imposed a mandatory duty on the reviewing court to order the applicable remedy provided therein, including injunctive relief to compel agency action unlawfully withheld or unreasonably delayed. See Forest Guardians v. Babbitt, 174 F.3d 1178, 1187 (10th Cir. 1999).

The Tenth Circuit has further specified that the Federal Rules of Appellate Procedure set forth the appropriate procedural framework for a district court's review of administrative agency actions under Section 706 of the APA. See Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1579-80 (10th Cir. 1994). Under this framework, the district court generally cannot "rely on evidence outside the administrative record" or "the *post hoc* rationalizations

of counsel," nor can it "attempt[] itself to supply a reasoned basis for agency action without regard to the contents of the administrative record."  Id.

**B.     Defendants' *Motion to Dismiss***

Applying the framework for judicial review of administrative agency actions set forth in Olenhouse, 42 F.3d at 1579-80, Defendants raise issues of mootness and ripeness by means of a motion to dismiss under Fed. R. App. P. 27.   Mootness and ripeness are jurisdictional issues, and thus they provide proper grounds on which to bring a motion to dismiss under this rule.  See 10th Cir. R. 27(A)(2); Colo. Interstate Gas Co. v. Fed. Energy Regulatory Comm'n, 890 F.2d 1121, 1126 (10th Cir. 1989).  For the reasons set forth below, the Court concludes that Plaintiff's claims pertaining to the USFS's consultation for, and approval of, the Annual Operating Plan/Instructions (AR 26.0) for grazing on the Copper Creek Allotment during the three-year period beginning with the 2001 grazing season are subject to dismissal on grounds of mootness, ripeness, or lack of finality.   Accordingly, Defendants' ***Motion to Dismiss*** is granted in part with respect to these particular claims and denied in part with respect to Plaintiff's other claims.

**1.     Mootness**

"Mootness, like ripeness and standing, has its constitutional origin in the 'case or controversy' limitation of Article III [of the United States Constitution] which insures that courts exercise their power only in cases where true adversary context allows informed judicial resolution."  Wiley v. Nat'l Collegiate Athletic Ass'n, 612 F.2d 473, 475 (10th Cir. 1979).  In this case, Defendants contend that two of the claims raised in Plaintiff's ***First***

*Amended Complaint* and *Motion for Review of Agency Action* are rendered moot by the written concurrences issued by the USFWS on May 10, 2002, and July 11, 2002.  (Ex. A, E to Def. Mem. In Supp. of Mot. to Dismiss).  First, Defendants assert that Plaintiff is no longer in a position to challenge the series of ESA consultation documents issued by the USFS on May 25, 2001 (AR 27.0, 28.0), on the grounds that they lack a written concurrence from the USFWS.  Second, Defendants assert that Plaintiff is no longer in a position to challenge the alleged inconsistency between the findings in the USFS's biological assessment regarding the Mexican Spotted Owl dated May 25, 2001 (AR 28.0), and the agency's finding that there is no "irreversible or irretrievable commitment of resources" under Section 7(d) of the ESA (AR 29.0).

The Court agrees that these two claims are now moot, and the Court is not persuaded that an exception to the mootness doctrine applies in this case, especially in light of the Tenth Circuit's opinion in S. Utah Wilderness Alliance v. Smith, 110 F.3d 724, 729-30 (10th Cir. 1997).  Accord Southwest Ctr. for Biological Diversity v. U.S. Forest Serv., 82 F. Supp. 2d 1070, 1079 (D. Ariz. 2000).  In ruling on Defendants' *Motion to Dismiss*, the Court may consider the series of correspondence attached to Defendants' motion, which evinces the completion of the ESA consultation process on the species in question for the Annual Operating Plan/Instructions for the three-year grazing period beginning with the 2001 grazing season.  See Smith, 110 F.3d at 729.  With the addition of the conservation measures specified by USFWS in its letter dated July 11, 2002, the USFS has revised its finding as to the effects that the Annual Operating Plan/Instructions for grazing during this period may

have on the Mexican Spotted Owl and its habitat, and this revised finding removes the alleged inconsistency with the requirements of Section 7(d) of the ESA that Plaintiff challenges in its ***First Amended Complaint***.  Thus, these claims are now moot.

### 2.   <u>Ripeness or Finality</u>

The exhibits attached to Defendants' ***Motion to Dismiss*** also raise questions of ripeness or finality with regard to Plaintiff's remaining challenges to the USFS's consultation for, and approval of, the Annual Operating Plan/Instructions (AR 26.0) for grazing on the Copper Creek Allotment for the three-year period beginning with the 2001 grazing season.  Specifically, such questions arise with regard to Plaintiff's claim that the USFS's factual findings which underlie the recently concluded ESA consultation process for the 2001 Annual Operating Plan/Instructions are unsupported by substantial evidence.  Such questions also logically extend to Plaintiff's claim that the Annual Operating Plan/Instructions for grazing during the three-year period in question is not consistent with the standards and guidelines in the Gila National Forest Plan as amended through 1996, as required by NFMA.  The Court concludes that these claims lack the requisite degree of ripeness or finality to permit adjudication by this Court at this time for the following reasons.

"In deciding whether an agency's decision is, or is not, ripe for judicial review, the Court has examined both the 'fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court consideration.'"  <u>Ohio Forestry Ass'n v. Sierra Club</u>, 523 U.S. 726, 733 (1998); <u>accord</u> <u>Sierra Club v. U.S. Dep't of Energy</u>, 287 F.3d 1256, 1262 (10th Cir. 2002).  This examination requires the Court to consider:  "(1) whether delayed

review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Ohio Forestry Ass'n, 523 U.S. at 733; accord Sierra Club, 287 F.3d at 1262-63.

The concept of "'final agency action'" under Section 704 of the APA, 5 U.S.C. § 704, is another "vital aspect of the requirement that issues be fit for review." Park Lake Res. L.L.C. v. U.S. Dep't of Agriculture, 197 F.3d 448, 450 (10th Cir. 1999). "'Administrative finality is interpreted pragmatically.'" Coalition for Sustainable Res., Inc. v. U.S. Forest Serv., 259 F.3d 1244, 1251 (10th Cir. 2001) (quoting Sierra Club v. Yeutter, 911 F.2d 1405, 1410 (10th Cir. 1990)).

Plaintiff "bears the burden of providing evidence to establish that the issues are ripe," and in making such a determination, the Court may consider "evidence not contained in the pleadings," provided that such evidence is reviewed under the standard employed in Fed. R. Civ. P. 56 in the event that the jurisdictional question of ripeness "is intertwined with the merits of the case." Id. at 1249. In this instance, the Court considers the exhibits attached to Defendants' *Motion to Dismiss* as evidence that some of Plaintiff's remaining claims are not yet ripe for review inasmuch as they pertain to the recently completed consultation process regarding the Annual Operating Plan/Instructions for grazing during the three-year period beginning with the 2001 grazing season.

The Court would benefit from further factual development of the remaining issues pertaining to the Annual Operating Plan/Instructions for grazing during this period because

the exhibits to Defendant's ***Motion to Dismiss*** evince a dialogue between USFS and USFWS that occurred after the Administrative Record was lodged in this case, and this dialogue appears to have resulted in a decision to modify the USFS's plan or instructions for grazing on the allotment during the three-year period in question.  Such dialogue and modifications are of obvious relevance to the Court's analysis of the sufficiency of the recently completed ESA consultation process for the Annual Operating Plan/Instructions for this period, as well as the consistency of Defendants' action during that period with the standards and guidelines in the Gila National Forest Plan.

The exhibits attached to Defendants' ***Motion to Dismiss*** also evince further administrative action regarding the Annual Operating Plan/Instructions, and judicial intervention based solely on the existing Administrative Record would inappropriately interfere with that particular action.    Interference with the Annual Operating Plan/Instructions for the three-year period in question would be inappropriate at this juncture because the procedural framework set forth in Olenhouse, 42 F.3d at 1580, requires that the Court limit its review of the merits of that action at this time to the Administrative Record on which the parties have based their appellate briefs, yet such review would be incomplete and uninformed without reference to the further administrative action that occurred after the Administrative Record was lodged.

Finally, as explained in Section II.D below, the hardship to Plaintiff caused by delayed review can be kept to a minimum by the simple mechanism of granting leave to file a second amended complaint and requiring Defendants to promptly file a supplement to the

Administrative Record containing all the documents necessary to complete the additional review that Plaintiff requests.  For these reasons, the Court concludes that Plaintiff's remaining challenges pertaining to the USFS's consultation for, and approval of, the Annual Operating Plan/Instructions for grazing during the three-year period beginning with the 2001 grazing season are not yet ripe for judicial review based on the existing Administrative Record.

### C.   Plaintiff's *Motion for Review of Agency Action*

It follows from the dismissal of the claims discussed in the previous section that Plaintiff's **Motion for Review of Agency Action** must be denied in part, on grounds of mootness, ripeness, or lack of finality, with respect to those claims which challenge the sufficiency of USFS's consultation for, and approval of, the Annual Operating Plan/Instructions for grazing during the three-year period beginning with the 2001 grazing season.  There remain two issues, however, that were raised in Plaintiff's **Motion for Review of Agency Action** and that cannot be dismissed at this point on these grounds.  Those issues are: (1) whether Defendants have unlawfully withheld or unreasonably delayed the initiation of the ESA consultation process for the entire ten-year term of the grazing permit for the Copper Creek Allotment, and (2) whether Defendants violated NFMA by issuing the term grazing permit in 1997 without regard to the permit's consistency with the Gila National Forest Plan (as amended in 1996).

With respect to these two issues, Defendants contend that they are not required to consult with the USFWS for the entire term of the 1997 grazing permit, or to ensure that

permit's consistency with the Gila National Forest Plan, because they allegedly lack any discretionary involvement or control over the reissuance of the permit due to Section 504 of the 1995 Rescissions Act. The Court agrees with Defendants that the 1997 grazing permit falls within the ambit of Section 504 of the 1995 Rescissions Act and, therefore, the fact that the environmental analyses required under NEPA and the ESA had not been completed at the time the permit was issued could not have precluded the agency from issuing the permit. The Court does not agree, however, that Section 504 of the 1995 Rescissions Act deprives Defendants of the discretionary involvement or control necessary to (1) ensure the permit's consistency with the Gila National Forest Plan at the time it was issued, (2) initiate and complete the ESA consultation process for the entire term of the 1997 grazing permit in a timely manner, and (3) take appropriate action in a timely manner based on the results of the ESA consultation process and the environmental analysis required under NEPA.

Under the plain language of Section 504 of the 1995 Rescissions Act, two conditions must be met before that section requires Defendants to issue a term grazing permit "on the same terms and conditions and for the full term of the expired or waived permit." Section 504(b). The first condition is that the preceding permit must expire or be waived before the USFS's scheduled completion date for the NEPA analysis and decision. See id. The second condition is that the failure to complete "the analysis required by NEPA and other applicable laws" must be the sole reason why "a new term grazing permit has not been issued to replace [the] expired or waived term grazing permit." Id. at § 504(c).

Even when these conditions are met, however, Defendants retain the authority to modify or reissue the terms and conditions of existing grazing permits "[u]pon completion of the scheduled NEPA analysis and decision for the allotment, . . . if necessary to conform to such NEPA analysis." Id. at § 504(b); see Fed. Lands Legal Consortium v. United States, 195 F.3d 1190, 1200 (10th Cir. 1999).  And since Section 504 only requires the issuance of a term grazing permit when the failure to complete the analysis required by NEPA and other laws is the sole reason why the permit has not been issued, see § 504(c), this section never deprived Defendants of the discretionary involvement or control necessary to modify, suspend, or cancel the grazing permit for reasons other than the failure to complete these required analyses.  Cf. Fed. Lands Legal Consortium, 195 F.3d at 1198 (noting that the Secretary of Agriculture and the USFS generally have discretion to require changes to grazing permits as they deem necessary).

In the present case, the 1997 term grazing permit indicates that the scheduled completion date for the NEPA analysis and decision was 1997.[1]  (AR 12.0, at 6.)  The previous term grazing permit issued in 1986 expired on December 31, 1996.  (AR 2.1, at 2.) Thus, to the extent that the failure to complete the analysis required by NEPA or other laws was the only possible reason for not reissuing the permit upon its expiration on December 31, 1996, Section 504(b) required Defendants to reissue the permit on the same terms and conditions as the 1986 permit which preceded it.

---

[1]Although there is no evidence in the Administrative Record that the NEPA analysis was completed in 1997, Plaintiff has not challenged the 1997 term grazing permit for this allotment on the grounds that the USFS failed to adhere to any deadlines established pursuant to Section 504(a) of the 1995 Rescissions Act.

Section 504 does not, however, deprive Defendants of the discretionary involvement or control necessary to initiate and complete the analyses required by NEPA and other laws, nor does this provision of the 1995 Rescissions Act deprive Defendants of the authority to make changes to the 1997 term grazing permit based on the results of those analyses or the requirements of the Gila National Forest Plan.  Indeed, Defendants' argument that the USFS lacks such discretionary involvement and control leads to an absurd result that is contrary to congressional intent and inconsistent with agency regulations.

When an agency of the federal government lacks discretionary involvement or control over an action (such as the issuance of a permit), then not only is that agency excused from the consultation process otherwise required under Section 7 of the ESA, see 50 C.F.R. § 402.03, the agency also is excused from compliance with NEPA, see Village of Los Ranchos de Albuquerque v. Barnhart, 906 F.2d 1477, 1482 (10th Cir. 1990) (citing Sierra Club v. Hodel, 848 F.2d 1068, 1089 (10th Cir. 1988)).  Thus, if Defendants totally lacked discretionary involvement or control with regard to the 1997 term grazing permit, then they would be completely exempt from any obligation to complete a NEPA analysis for that permit, and it would be superfluous and absurd for Congress to include language requiring the USFS to establish or adhere to any deadlines for completing such analyses.  Cf. Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.").

The plain language of Section 504 of the 1995 Rescissions Act does not provide such a complete exemption from federal environmental laws, nor can such an exemption be

implied from the circumstances in which the statute was enacted.  "[G]razing permits are significant governmental action requiring an Environmental Impact Statement (EIS)" under NEPA.  Valdez v. Applegate, 616 F.2d 570, 571 (10th Cir. 1980) (citing Natural Res. Def. Council, Inc. v. Morton, 388 F.Supp. 829, 838-841 (D.D.C. 1974), aff'd, 527 F.2d 1386 (D.C. Cir. 1976)).  In addition, NFMA requires that all permits, contracts, and other instruments for the use and occupancy of national forest system lands must be consistent with the forest plan.  See 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10; Forest Service Manual § 2213; Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1168 (10th Cir. 1999); Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1377 (9th Cir. 1998).  The issuance of a grazing permit also falls within the definition of "agency action" necessary to trigger the consultation process under Section 7 of the ESA.  See 16 U.S.C. § 1536(a)(2); Natural Res. Def. Council v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998).

Construing the 1995 Rescissions Act as a complete exemption from the requirements of these laws would be contrary to the principle that "repeals (or suspension) of legislation by implication are disfavored, especially 'when the claimed repeal rests solely on an Appropriations Act.'"  Forest Guardians, 174 F.3d at 1192 (quoting Tenn. Valley Auth. v. Hill, 437 U.S. 153, 190 (1978)).  The legislation at issue here is a rider to an appropriations bill that was passed without congressional debate.  An earlier version of the rider that would have completely exempted term grazing permits from NEPA requirements was debated but never voted upon.  See Greater Yellowstone Coalition v. Bosworth, 209 F. Supp. 2d 156, 162 (D.D.C. 2002).  As noted above, the plain language of the version of the legislation that was

signed into law simply grants an extension of time for the completion of the analyses required by NEPA and other environmental laws; it does not excuse the USFS from completing such analyses on schedule or taking appropriate action based on the results of those analyses or other preexisting requirements under NFMA.  See id. at 162-63.  Under these circumstances, it would not be reasonable to infer the complete exemption that Defendants seek from the limited extension that Congress granted.

Lacking such a complete exemption, Defendants fall back on the position that they have partially complied with their legal duties under NFMA and the ESA by analyzing the impacts of the Annual Operating Plan/Instructions for grazing during a three-year period beginning with the 2001 grazing season.  Partial efforts toward completing a legally required duty, however, "do not prevent a court from compelling action under § 706(1)" of the APA.  Southern Utah Wilderness Alliance v. Norton, 301 F.3d 1217, 1236 (10th Cir. 2002).  The agency action in this case encompasses the entire ten-year term of the grazing permit, not just a particular grazing season.  See Conner v. Burford, 848 F.2d 1441, 1454 (9th Cir. 1988); Greenpeace v. Nat'l Marine Fisheries Serv., 80 F. Supp. 2d 1137, 1143 (W.D. Wash. 2000).  Further, there is no indication in the record that the consultation regarding the 2001 Annual Operating Plan/Instructions complies with, or is intended to form part of, an incremental-step analysis under 50 C.F.R. § 402.14(k).  Thus, the fact that Defendants participated in the ESA consultation process for the Annual Operating Plan/Instructions regarding a three-year period beginning with the 2001 grazing season does not preclude this Court from compelling further consultation on the entire term of the grazing permit.

Partial compliance with NFMA's consistency requirement also does not insulate Defendants' decision to issue the 1997 term grazing permit from judicial review at this time. See Norton, 301 F.3d at 1236.  In this regard, the Court notes that the 1997 grazing permit's special terms and conditions specifically refer to the standards and guidelines contained in the original 1986 Forest Plan. (AR 2.0, 1986 Forest Plan at 22-49; AR 12.0, at 7).  The permit is silent, however, with respect to the 1996 amendment to the forest plan, and Defendants have not pointed to any evidence in the Administrative Record showing that the USFS actively and explicitly determined whether the permit's terms and conditions were consistent with the standards and guidelines contained in that amendment at the time the permit was reissued in 1997.  (AR 2.0, 1996 Forest Plan Amendment at 5, 87-95.)  Rather, Defendants take the erroneous position that the 1995 Rescissions Act entirely precluded them from applying NFMA's consistency requirement to the issuance of the 1997 term grazing permit.  Under these circumstances, the possibility that Defendants' have partially complied with NFMA's consistency requirement does not prevent the Court from compelling them to carry out their legal duty under the statute.   See Norton, 301 F.3d at 1230-32, 1236.

Defendants also cannot avoid their legal duties under NFMA by means of the alternative argument that they have considerable discretion in choosing how to implement the forest plan's standards and guidelines.  Although Defendants may have discretion as to whether to apply forest plan amendments retroactively to permits, contracts, and other instruments already issued, see Forest Guardians v. Dombeck, 131 F.3d 1309, 1312-13 (9th Cir. 1997), in this case the 1997 term grazing permit was issued after the 1996 amendment

-33-

to the forest plan, at which point the amendment was already incorporated into the plan for purposes of NFMA's consistency requirement, see Forest Service Manual § 2213.2 ("New term grazing permits must be consistent with the forest plan direction at the time of issuance.").   And while the USFS may possess a degree of discretion over the implementation of some of the guidelines in the forest plan, see Lamb v. Thompson, 265 F.3d 1038, 1047 (10th Cir. 2001), it does not follow that NFMA's consistency requirement "is itself wholly discretionary," Norton, 301 F.3d at 1228.   Indeed, the 1996 forest plan amendment specifically indicates that the standards contained therein are not discretionary. (AR 2.0, Record of Decision for 1996 Forest Plan Amendment at 87.)

Unlike Lamb, 265 F.3d at 1050, the Administrative Record in this case does not show that Defendants "actively and explicitly balanced, on the record, the [relevant] provisions of the Forest Plan" at the time the permit was reissued.   Further, the standards and guidelines in the 1996 forest plan amendment, which are specifically aimed at the recovery of species protected under the ESA, are less subject to discretionary balancing than those at issue in Lamb, 265 F.3d at 1049.   For example, the nondiscretionary standard for grazing management in the 1996 forest plan amendment states that:   "Forage use by grazing ungulates *will* be maintained at or above a condition which assures recovery and continued existence of threatened and endangered species."   (AR 2.0, Record of Decision for 1996 Forest Plan Amendments at 94.) (Emphasis added.)

The only evidence that Defendants cite in their attempt to show the 1997 term grazing permit's consistency with the Gila National Forest Plan consists of some raw data from

riparian transects collected between 1990 and 1996 (AR 3.0, 4.0, 5.0, 6.0, 7.0, 10.0), and a grazing capacity analysis dated January 17, 1997 (AR 13.0).  (Defs. Opp. to Pltf.'s Mot. for Review of Agency Action at 51-52.)  This grazing capacity analysis is dated nine days after the permit was reissued (AR 12.0) and contains no reference to the 1996 amendment or the recovery of threatened or endangered species.  The Court cannot reasonably discern the path of the agency's reasoning based on Defendants' selective reference to the minimal raw data contained in the riparian transects, nor can the Court rely on a grazing capacity analysis issued after the fact to supply a *post hoc* rationalization for the agency's acts or omissions regarding the grazing permit's consistency with the forest plan.  See Olenhouse,  42 F. 3d at 1579-80.

Finally, Defendants' assertions that the 1997 term grazing permit is not required to be consistent with the standards and guidelines contained in the forest plan (as amended through 1996), or that those standards and guidelines are so discretionary as to be unenforceable in this instance, cannot be reconciled with the rationale stated in the USFWS's Final Designation of Critical Habitat for the Mexican Spotted Owl.  See 66 Fed. Reg. at 8543.  In that designation, the USFWS found that the 1996 amendment to the Gila National forest plan is "a *legally operative* plan/agreement that addresses the maintenance and improvement of the primary constituent elements important to the species and manages for the long-term conservation of the" Mexican Spotted Owl.  Id. (Emphasis added.)  The USFWS further found that the forest plan "provides assurances that the management plan *will be implemented* since the [US]FS in the Southwest region *has authority to implement*

-35-

*the plan and has obtained all of the necessary authorizations or approvals.*"  Id.  (Emphasis

added.)  To now claim that the 1996 amendment to the forest plan is *not* legally operative,

or will *not* be implemented with respect to a 1997 grazing permit for an allotment known to

contain numerous PACs inhabited by Mexican Spotted Owls, would undermine the rationale

behind the USFWS's decision not to include New Mexico's national forest lands in the

critical habitat designation for the owl.

Accordingly, the Court determines that Defendants are required by law to ensure that

the 1997 term grazing permit for the Copper Creek Allotment is consistent with the Gila

National Forest Plan (as amended through 1996).  The Court further determines that

Defendants are required by law to initiate and complete a consultation under Section 7 of the

ESA that is sufficiently broad in scope to cover the entire term of the 1997 grazing permit

for the Copper Creek Allotment.  Defendants' failure to undertake these actions required by

the ESA and NFMA constitutes "agency action unlawfully withheld or unreasonably

delayed" under Section 706(1) of the APA, and the Court has no choice but to compel such

action.[2]  See Forest Guardians, 174 F.3d at 1187.

While the Court will order Defendants to comply with their legal duties under NFMA

and the ESA with respect to the 1997 term grazing permit, at this time the Court does not

---

[2]Defendants' failure to actively and explicitly consider the requirement of consistency with the 1996 Forest
Plan Amendment when reissuing the term grazing permit in 1997 also might be construed as a failure to consider a
relevant factor or "important aspect of the problem," Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43,  thus placing the
reissuance of the permit within the definition of "arbitrary" and "capricious" action under Section 706(2)(A) of the
APA, 5 U.S.C. § 706(2)(A).  The Court concludes, however, that the remedy provided in Section 706(1) of the APA,
5 U.S.C. § 706(1), is more apposite in this instance because NFMA's consistency requirement is better described as
a statutory mandate or legal duty in and of itself, rather than a mere factor or aspect of the problem to be considered.

reach the issue of whether livestock grazing on the Copper Creek Allotment must be enjoined, in whole or in part, based on Defendants' failure to comply with these duties. That issue is inextricably intertwined with Plaintiff's claims regarding the ESA consultation process for the Annual Operation Plan/Instructions for the three-year period beginning with the 2001 grazing season. As noted above, those claims are not yet ripe for judicial review based on the existing Administrative Record. Their disposition must await supplementation of the Administrative Record and further briefing, as provided below.

### D.   Plaintiff's *Motion for Leave to File Amended Complaint*

Fed. R. Civ. P. 15(a) allows a party to amend its pleading by leave of the Court and provides that leave shall be freely given when justice so requires.

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

Foman v. Davis, 371 U.S. 178, 182 (1962); see Castleglen, Inc. v. Resolution Trust Corp., 984 F.2d 1571, 1585 (10th Cir. 1993). Except for the two particular claims that have been rendered moot as described in Section II.B.1 above, Defendants do not provide any compelling reasons for denying Plaintiff's *Motion for Leave to File Amended Complaint*. Thus, with the exception of these two claims, the Court finds that Plaintiff has stated proper grounds under Fed. R. Civ. P. 15(a) for amending its complaint.

The Court further finds that Plaintiff's *Motion for Leave to File Amended Complaint* can be processed in a manner that is not fundamentally inconsistent with the framework for judicial review set forth in <u>Olenhouse</u>, 42 F.3d at 1580.  To avoid such inconsistency, the Court will treat Plaintiff's proposed amended pleading in a manner analogous to a petition for review of an agency order under Fed. R. App. P. 15(a).  The Court also will require Defendants to answer that amended pleading and to file a supplement to the Administrative Record in the manner prescribed by Fed. R. App. 16 and 17.

Accordingly, Plaintiff's *Motion for Leave to File Amended Complaint* is denied in part with respect to the two claims which are now moot (as explained in Section II.B.1 above), and Plaintiff's motion is granted in part with respect to the other pending claims which are the subject of that motion.  Plaintiff is granted leave to file a second amended complaint within thirty (30) days of the entry of this *Memorandum Opinion and Order*, and Defendants are granted sixty (60) days from the date of service of such amended complaint to file their answer.  Defendants are directed to file a supplement to the Administrative Record concurrently with their answer.   Any controversies regarding the sufficiency of Defendants' supplement to the Administrative Record can be raised in the briefs or by motion pursuant to Fed. R. App. P. 27.  By separate order, the Court will set a briefing schedule on any remaining issues in this case.

III.     **CONCLUSION**

For the foregoing reasons, Defendants' *Motion to Dismiss* is granted in part and

denied in part; Plaintiff's *Motion for Review of Agency Action* is granted in part and denied

in part; and Plaintiff's *Motion for Leave to File Amended Complaint* is granted in part and

denied in part.

**IT IS, THEREFORE, ORDERED** that *Federal Defendants' Motion to Dismiss,*

*Memorandum in Support, and Supplemental Brief on the Merits* [Doc. No. 38] is

**GRANTED IN PART** as follows:

1.    Plaintiff's claim that the series of ESA consultation documents issued
      by the USFS on May 25, 2001 (AR 27.0, 28.0) lack a written
      concurrence from the USFWS is **DISMISSED AS MOOT**.

2.    Plaintiff's claim that the USFS's finding under Section 7(d) of the ESA
      (AR 29.0) is inconsistent with the USFS's biological assessment
      regarding the Mexican Spotted Owl dated May 25, 2001 (AR 28.0) is
      **DISMISSED AS MOOT**.

3.    Plaintiff's other claims pertaining to the USFS's Annual Operating
      Plan/Instructions for ongoing grazing activities during the three-year
      period beginning with the 2001 grazing season are **DISMISSED**
      **WITHOUT PREJUDICE** due to lack of ripeness or finality, subject
      to the deadline for filing a second amended complaint provided below.

**IT IS FURTHER ORDERED** that *Federal Defendants' Motion to Dismiss,*

*Memorandum in Support, and Supplemental Brief on the Merits* [Doc. No. 38] is

**DENIED IN PART** with respect to Plaintiff's claims that (1) Defendants have unlawfully

withheld or unreasonably delayed the initiation of the ESA consultation process for the entire

ten-year term of the grazing permit for the Copper Creek Allotment, and (2) Defendants

violated NFMA by issuing the term grazing permit in 1997 without regard to the permit's

consistency with the Gila National Forest Plan (as amended in 1996).

**IT IS FURTHER ORDERED** that Plaintiff's ***Motion for Review of Agency Action***

[Doc. No. 8] is **GRANTED IN PART** as follows:

1.  With respect to the entire term of the 1997 grazing permit for the Copper Creek Allotment, Defendants are declared to have unreasonably delayed consultation under Section 7 of the ESA regarding the Mexican Spotted Owl, Spikedace, Loach Minnow, and their critical habitat, and Defendants are hereby ordered to initiate such consultation as soon as possible, but no later than thirty (30) days after the entry of this ***Memorandum Opinion and Order***.

2.  Defendants are declared to have unreasonably delayed the implementation of their statutory duty to ensure that livestock grazing for the entire term authorized by the 1997 grazing permit for the Copper Creek Allotment is consistent with the Gila National Forest Plan (as amended through 1996), and Defendants are hereby ordered to carry out that duty by modifying the 1997 term grazing permit for the Copper Creek Allotment as soon as possible so as to explicitly incorporate the standards and guidelines from the 1996 amendment to the Gila National Forest Plan into the permit and ensure the permit's consistency with the Gila National Forest Plan (as amended through 1996).

**IT IS FURTHER ORDERED** that Plaintiff's ***Motion for Review of Agency Action***

[Doc. No. 8] is **DENIED IN PART** with respect to those claims which are dismissed on

grounds of mootness, ripeness, or lack of finality.

**IT IS FURTHER ORDERED** that Plaintiff's ***Motion for Leave to File Amended***

***Complaint*** [Doc. No. 42] is **DENIED IN PART** with respect to those claims which are

dismissed as moot, and **GRANTED IN PART** in all other respects, subject to the following

deadlines:

1.   Plaintiff is granted leave to file a second amended complaint within thirty (30) days of the entry of this ***Memorandum Opinion and Order***.

2.   In the event that Plaintiff files a second amended complaint within thirty (30) days of the entry of this ***Memorandum Opinion and Order***, Federal Defendants are granted sixty (60) days from the date of service of Plaintiff's second amended complaint to file an answer to that complaint and a supplement to the Administrative Record concerning the acts or omissions that are the subject of the second amended complaint.

**SO ORDERED**, this 31st day of December, 2002, in Albuquerque, New Mexico.


**M. CHRISTINA ARMIJO**
United States District Judge